UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD ETHERIDGE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-07204 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| HUDSON GROUP RETAIL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Richard Etheridge worked for Defendant Hudson Group as a night-shift delivery driver at O'Hare, but not for long. He had an attendance problem, and then some. After Etheridge failed to show up for work a dozen times, Hudson Group fired him.

Etheridge later sued his former employer for discrimination. He claims that Hudson Group fired him on the basis of his sex, race, age, and disability. After discovery, Hudson Group moved for summary judgment.

For the following reasons, the motion for summary judgment is granted.

**Background**

The Court begins with a wrinkle involving the facts. The punchline is that there is no genuine issue of material fact for a simple reason: Plaintiff did not respond to the motion for summary judgment. Only one side of the scale contains any evidence, so it tips decisively in Defendant's favor.

Usually, courts making a summary judgment determination "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013). But here, Defendant's motion for

summary judgment is unopposed. That is, Etheridge never filed any response to the motion, and he never filed a response to the Rule 56.1 Statement of Facts. He didn't file anything in response. And he didn't offer any facts of his own.

That silence has consequences. Under Local Rule 56.1(e)(3), "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *See* L.R. 56.1(e)(3).

When the non-moving party does not respond to a movant's Rule 56.1 statement of facts, the Court may accept the movant's "'uncontroverted version of the facts to the extent that it is supported by evidence in the record.'" *Brand v. Murawski*, 2021 WL 1222800, at *2 (N.D. Ill. 2021) (quoting *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012)); *see also Hall v. Nicholson*, 584 F. Supp. 3d 589, 591 (N.D. Ill. 2022) (considering admitted all facts "not 'controverted with specific citations to evidentiary material'") (quoting L.R. 56.1(e)(3)); *Washington v. McDonough*, 2021 WL 1962420, at *3 (N.D. Ill. 2021) (same).

Here, Hudson Group filed a Rule 56.1 Statement of Facts (Dckt. No. 88), and properly supported those facts with admissible evidence. Plaintiff filed no response. So the Court considers all the facts from that Statement of Facts as undisputed to the extent that the evidence in the record supports them.

Hudson backed up its Statement of Facts with admissible evidence. So, this Court adopts the facts in the Statement of Facts in their entirety. For the sake of simplicity, the Court will not recount all of the facts, but will simply summarize the most important facts that bear on the motion.

I.    **Plaintiff's Employment at Hudson Group**

This case is about Richard Etheridge's employment dispute with his former employer, Hudson Group.  Defendant Hudson Group ("Hudson") describes itself as a "travel retailer."  *See* Def.'s Statement of Facts, at ¶ 5 (Dckt. No. 88).  Essentially, it operates stores and warehouses within airports.  *Id.*  If you have flown, you have probably shopped at Hudson Group.

Richard Etheridge is a white male, born in 1959.  *Id.* at ¶ 4.  He worked for Hudson from October 18, 2018, to July 20, 2019.  *Id.* at ¶¶ 6, 10.  He was a night-shift delivery driver for its O'Hare International Airport location.  *Id.* at ¶ 6.

As a night-shift driver, Etheridge normally worked from 8:00 p.m. until 5:00 a.m.  *Id.* His job duties included loading "skids" onto his truck, driving the loaded truck to O'Hare, unloading the skids there, and then doing it all over again.  *Id.*

During his employment, Etheridge was a union member of Local 710, International Brotherhood of Teamsters.  *Id.* at ¶ 7.  As a result, the collective bargaining agreement between the Union and Hudson covered his employment.  *Id.*

A few months after he was hired, on February 21, 2019, Etheridge was involved in a physical altercation with a Black co-worker.  *Id.* at ¶ 11.  Etheridge was not disciplined as a result, but the incident did result in the termination of the other coworker.  *Id.* at ¶ 12.

Etheridge was injured in the workplace bust-up, however.  *Id.* at ¶ 13.  Although Hudson characterizes these injuries as "minor," Etheridge alleged in the complaint that he suffered a broken jaw, a sprained nose, arm injuries, a separated rotator cuff, and an injured hip and knee. *See id.*; Second Am. Cplt., at Count I, ¶ 15 (Dckt. No. 64).  He testified that he was on "Workman's Comp" for weeks in the aftermath.  *See* Etheridge Dep. Tr., at 292:10–18 (Dckt. No. 88-2).  However, medical providers permitted him to return to work in full capacity by

3

March 15, 2019 – less than a month after the altercation.  *See* Def.'s Statement of Facts, at ¶ 13 (Dckt. No. 88).

After the altercation, in May of 2019, a position as a day-shift delivery driver opened up at Hudson.  *See* Second Am. Cplt., at Count II, ¶¶ 16–17, Count III, ¶¶ 11–14, Count IV, ¶¶ 11–13 (Dckt. No. 64).  Etheridge alleges that he applied for, but did not receive, the position.  *Id.*

Hudson followed a bidding process for Union job openings like the day-shift position. *Id.* at ¶ 29.  Under that process, positions were awarded to qualified employees on the basis of seniority.  *Id.*  So, when an employee was otherwise qualified and bid for a position, she would receive the position if she were the most senior employee to bid.

The day-shift position was different than the night-shift position that Etheridge had at that time.  It required the driver to make deliveries to Midway International Airport, not just O'Hare. *Id.* at ¶ 31.

A driver delivering goods to Midway needed to have a special certification.  Specifically, Midway drivers needed to be "badged" for Midway, meaning that the driver had to go through certain testing and licensing before driving within the airport's premises.  *Id.*  Midway drivers also needed to hold a Commercial Driver's License, or CDL.  *Id.*

It is unclear whether the Midway "badging" requirement was internal to Hudson.  That is, it is unclear whether the Midway airport itself required that drivers be badged before delivering to the premises, or whether badging was Hudson's own internal requirement.  In any event, in order for a driver to work the day shift and deliver to Midway on behalf of Hudson, he needed to be "badged" for Midway.

Etheridge did not have a Midway badge when he applied for the position.  *Id.* at ¶ 32. What's more, besides Etheridge's unsubstantiated claims to the contrary, there is no evidence

that he bid on the position. *Id.* at ¶ 30. He could not recall when he bid on the position. *Id.* And there is no evidence that he ever signed his name to a "bid list" for the position. *Id.*

In the end, Etheridge never got the job. The day-shift position was instead given to two younger, non-disabled, African American women. They were Angelica Clark and Ceara Weeks. *See* Def.'s Statement of Facts, at ¶ 28 (Dckt. No. 88).

At least one of those two, Angelica Clark, was more senior than him. *Id.* at ¶ 36. And she was qualified: she had a CDL license and was badged at Midway. *Id.* at ¶¶ 38–40.

Clark was also working the day-shift position before Etheridge purports to have bid for it. *Id.* at ¶ 35. Etheridge claims to have bid for the position in May 2019. *Id.* at ¶ 28. Clark had been working day shift as early as October 24, 2018. *Id.* at ¶ 35.

The other individual identified by Etheridge, Ceara Weeks, was similarly qualified. *Id.* at ¶ 42. She had a CDL license, issued in August of 2018. *Id.* at ¶ 38. She was also badged for Midway, although it is unclear whether she became badged before starting at the day-shift position. *Id.* at ¶ 40.

Etheridge also dealt with various health issues during his employment with Hudson. The medical issues involved injuries from the fight, and breathing issues.

First, Etheridge needed physical therapy to treat the injuries he suffered in the workplace altercation. *Id.* at ¶ 51. These appointments occurred during the daytime, while he was off work. They took place at 9:00 a.m., 8:45 a.m., 2:00 p.m., 1:30 p.m., and 10:00 a.m. *Id.* He did not provide Hudson with any doctor's notes excusing him from work after any of these appointments. *Id.*

Separately, Etheridge also alleges that he became disabled as a result of his work for Hudson. According to Etheridge, he developed "respiratory issues" after "being exposed to toxic materials" at O'Hare. *See* Second Am. Cplt., at Count I, ¶¶ 14–15 (Dckt. No. 64).

Etheridge testified that he became disabled with shortness of breath as a result of his exposure to the toxic chemicals. *See* Def.'s Statement of Facts, at ¶ 45 (Dckt. No. 88). He alleges that these toxic chemicals came from paint fumes that he breathed in while making deliveries in various construction areas at O'Hare. *See* Second Am. Cplt., at Count I, ¶ 15 (Dckt. No. 64).

According to his deposition testimony, he began to experience shortness of breath around June 2019. *See* Def.'s Statement of Facts, at ¶ 45 (Dckt. No. 88). He sought medical care for his respiratory issues on June 9, 2019 at Swedish Covenant Hospital. *Id.* at ¶ 46. Medical records from that visit state that he was seen for "acute seasonal allergic rhinitis," otherwise known as hay fever. *Id.* at ¶¶ 48–49. He was prescribed Zyrtec, an allergy medication, and given a doctor's note that permitted him to return to work three days later, on June 12, 2019. *Id.* at ¶ 59; Etheridge Dep. Tr., at 264:2–12 (Dckt. No. 88-2).

## II. Plaintiff's Termination From Hudson Group

In the end, Etheridge's employment at Hudson was brief. He was fired on July 29, 2019 – less than a year after he was hired. *See* Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 88).

Hudson states that Etheridge was fired for his repeated violations of its attendance policy. *Id.* at ¶¶ 14–25. That policy, in short, provides that if an employee "no-call, no-shows" – meaning if they don't show up to work without letting Hudson know in advance – four times, the employee may be terminated. *Id.* at ¶ 14. Four strikes and you're out.

Under the policy, each no-call, no-show can result in a warning. *Id.* The first warning is verbal. The second and third are written. The third gets accompanied by a two-day suspension. And the fourth warning results in termination. *Id.* Hudson made Etheridge aware of this policy when he was hired. *Id.* at ¶ 8.

Etheridge had a bad track record when it came to following Hudson's attendance policy. He no-called, no-showed a dozen times in his short tenure with Hudson. *Id.* at ¶¶ 15–25.

The first time was November 17, 2018. The second was on December 1, 2018. *Id.* at ¶ 15. He received a verbal warning for these two absences on December 9, 2018. *Id.*

He received a second warning – this time in writing – on April 22, 2019. In the lead-up to receiving that warning, he had not shown up for work five more times: on February 16, March 1, March 15, April 12, and April 20. *Id.* at ¶ 17.

In the months that followed his second warning, Etheridge no-called, no-showed on four more days: May 10, May 24, June 7, and June 21. Although Etheridge had provided a medical provider note excusing him from some work during this time, none of these dates was excused by the note. *Id.* at ¶ 24. As a result, he received another written warning on June 27, 2019. *Id.* at ¶ 21. This warning was labeled as his "Final Warning." *Id.* He also received a one-day suspension. *Id.*

The last straw was on July 19, 2019. *Id.* at ¶ 25. Etheridge no-called, no-showed that day. He was terminated on July 23. *Id.*

In the wake of his termination, on December 4, 2020, Etheridge sued Hudson. He amended his complaint once, on February 16, 2022 (Dckt. No. 64). In the Second Amended Complaint, he brought a number of claims: disability discrimination, reverse race

discrimination, sex discrimination, and age discrimination. *See* Second Am. Cplt., Counts I–V (Dckt. No. 64).

Discovery was a bumpy ride. Etheridge left a number of combative, threatening voicemails for employees of Hudson Group, which prompted admonitions from the Court. *See, e.g.*, 12/7/21 Order (Dckt. No. 57); 3/17/22 Order (Dckt. No. 73).

Etheridge was combative at his deposition, too, prompting this Court to order Etheridge's counsel to address his conduct. *See* 4/8/22 Order (Dckt. No. 76); 4/12/22 Order (Dckt. No. 78). In fact, Etheridge was so surly and unhinged that this Court contemplated sanctions, including the possibility of the entry of judgment against him. But the conduct took place on the doorstep of summary judgment, so in the end, the Court elected to decide the case on the merits.

Instead of defending his conduct, Plaintiff's counsel withdrew from the case. His counsel did "not believe he is in full control of his senses and cannot continue to be abused by him." *See* 6/24/22 Letter (Dckt. No. 84). Etheridge left a series of voicemails for his counsel, in the middle of the night, "wherein he was significantly raising his voice, vulgar and abusive in his tone and manner." *Id.*

On June 30, 2022, Hudson moved for summary judgment (Dckt. No. 86). And, as discussed, Etheridge did not respond.

### Legal Standard

Defendant's Motion for Summary Judgment (Dckt. No. 86) is unopposed. As the Court has already discussed, that changes some things, but not everything.

"Where a party fails to respond to a motion for summary judgment, the Court may exercise its discretion properly and rule on the merits of the unopposed motion." *United Cent. Bank v. Findley*, 2013 WL 5408660, at *2 (N.D. Ill. 2013).

But a non-movant's failure to respond to a summary judgment motion does not "automatically result in judgment for the movant." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (citation omitted). As the Advisory Committee Comments to the Federal Rules of Civil Procedure make clear, "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion." *See* Fed. R. Civ. P. 56, Advisory Committee Comments to 2010 Amendments. An unopposed summary judgment motion is not a get-out-of-court free card. There is no summary judgment by default.

The Court must still rule on the merits of the unopposed Motion, just as it would any other summary judgment motion. So the movant must still show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993); *Att. Casualty Ins. Co.*, 2018 WL 3208482, at *3; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). The movant still bears "the burden of offering proof as to all of the elements of their claim demonstrating that they are entitled to judgment, whether or not the [non-moving party] offers proof to the contrary." *Laborers' Pension Fund v. Loucon Constr.*, 2004 WL 2538298, at *5 (N.D. Ill. 2004).

The key point is that "summary judgment motions, even when unopposed, must be carefully scrutinized to ensure that the record warrants the relief requested." *Crisafulli v. Garcia*, 380 F. Supp. 2d 986, 987 (N.D. Ill. 2005); Fed. R. Civ. P. 56, Advisory Committee Comments to 2010 Amendments. So the Court considers whether Hudson's Motion and supporting materials show that it is entitled to judgment as a matter of law based on the undisputed material facts in the record. *See Harris v. Skokie Maid & Cleaning Serv., Ltd.*, 2013 WL 3506149, at *3 (N.D. Ill. 2013). And again, under Local Rule 56.1(e)(3), the Court may

deem admitted each material fact set out in Defendant's Statement of Facts in light of Plaintiff's failure to respond.

## Analysis

Etheridge's asserts five claims in his Second Amended Complaint, all of which sound in discrimination.

Count I alleges disability discrimination in violation of the Americans with Disabilities Act ("ADA") and the Civil Rights Act of 1991. Count II alleges reverse race discrimination in violation of Title VII of the Civil Rights Act of 1964. Count III alleges sex discrimination in violation of Title VII of the Civil Rights Act of 1964. Count IV alleges age discrimination in violation of the ADEA. And Count V alleges willful age discrimination under the ADEA. *See* Second Am. Cplt. (Dckt. No. 64).

That's a lot of claims to keep track of. But the gist is that Etheridge alleges discrimination by his employer on the basis of his sex, age, race, and disability. Defendant moves for summary judgment on all of Etheridge's claims.

Like all employment discrimination cases, the ultimate issue is whether the evidence permits "a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Miller v. Chicago Transit Auth.*, 2020 WL 5547877, at *3 (N.D. Ill. 2020), *aff'd*, 20 F.4th 1148 (7th Cir. 2021) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020)). A plaintiff may carry this burden under the *McDonnell Douglas* burden-shifting method or by adducing direct evidence, that, considered as a whole, allows a reasonable factfinder to conclude that the proscribed factor caused his termination. *Id.* (citing *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019)).

The Court is not aware of any direct evidence of discrimination against Etheridge based on race, sex, age, or disability. The Court turns to the *McDonnell Douglas* burden-shifting analysis to Etheridge's discrimination claims to determine whether the Defendant is entitled to summary judgment. *See Keeton v. Morningstar, Inc.*, 667 F.3d 887, 885 (7th Cir. 2012).

The burden-shifting analysis of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973) proceeds as follows: A plaintiff must first establish a prima facie case of discrimination. He can do so by demonstrating that (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *See Kuttner v. Zarumba*, 819 F.3d 970, 976 (7th Cir. 2016) (quoting *Keeton*, 667 F.3d at 885).

If the plaintiff establishes these four factors, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for terminating his employment. *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020). If the defendant meets its burden, then the burden shifts back to the plaintiff to show that the defendant's reasons for terminating his employment were pretext for discrimination. *Id.*

## I.     Sex and Race Discrimination Claims (Counts II & III)

With that framework in mind, the Court begins with Etheridge's sex and race discrimination claims.

Again, a plaintiff sets out a prima facie case of discrimination if he can show that: (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment.

That's the traditional analysis.  Here, however, Etheridge alleges "reverse" race and sex discrimination.  Etheridge is a white male, and he alleges that Hudson discriminated against him on the basis of his race and his sex.  So, as he acknowledges in his Second Amended Complaint, he brings reverse discrimination claims.

The Seventh Circuit applies a heightened standard in reverse discrimination cases.  In such cases, the plaintiff must show "(1) that the [defendant] has an inclination to discriminate against Caucasians [or men] or evidence that there is something 'fishy' about the facts at hand; (2) [the plaintiff was] meeting the [defendant's] legitimate professional expectations; (3) [he] suffered an adverse employment action; and (4) the [defendant] treated [him] less favorably than similarly situated individuals who are outside of their protected class.  *Miller*, 2020 WL 5547877, at *3 (quoting *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016)); *see also Holloway v. Soo Line R.R. Co.*, 2018 WL 488259, at *12 (N.D. Ill. 2018), *aff'd*, 916 F.3d 641 (7th Cir. 2019) (applying reverse discrimination analysis to a sex discrimination claim).

The Court reviews Etheridge's race and sex discrimination claims under this heightened standard.  In the end, Etheridge failed to make a prima facie showing that he was discriminated against because of either his sex or race.

Etheridge's race and sex discrimination claims can be separated into two buckets:  his termination, and his losing out on the day-shift position.  In other words, Etheridge first alleges that Hudson terminated his employment because of his race.  Second, he alleges that Hudson discriminated against him by overlooking him for the day-shift position because of his race and sex.  *See* Second Am. Cplt., Counts II–III (Dckt. No. 64).

The undisputed facts support neither allegation.  Etheridge cannot meet prong number one of the test.  He fails at the first hurdle.  Simply put, the facts show no evidence that Hudson

has an inclination to discriminate against Caucasians or men. And there is nothing "fishy" about the facts at hand that would suggest otherwise.

The Court first considers Etheridge's claims of discriminatory termination on the basis of his race. In support of this claim, the Second Amended Complaint puts forward a handful of purportedly race-based incidents at Hudson before Etheridge's termination.

For starters, not all of the events cited by Etheridge suggest any bias on the part of Hudson. For example, Etheridge alleges that he saw Black co-workers taking drugs in their work vehicles, and that he brought complaints about this behavior to his managers. *See* Second Am. Cplt., at Count II, ¶ 14 (Dckt. No. 64). Etheridge also points to his workplace altercation with a Black co-worker. *Id.* at ¶ 15.

The Court cannot reasonably glean from these incidents any inclination on the part of Hudson to discriminate against Caucasians. With respect to the workplace altercation, the coworker involved was fired. *See* Def.'s Statement of Facts, at ¶ 58 (Dckt. No. 88). Etheridge, on the other hand, was not disciplined. *Id.* The fact that the co-worker involved in the incident was Black has no bearing on Hudson's inclination to discriminate.

And although some of Etheridge's other allegations in the complaint may go toward Hudson's inclination to discriminate, Etheridge's own testimony ultimately disproves each allegation. There's nothing there.

For example, although Etheridge claims he was the only non-Black delivery driver at his workplace, he later acknowledged otherwise at deposition. *See* Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 88). He likewise admitted that he never in fact witnessed his Black co-workers taking drugs in their vehicles. *Id.* at ¶¶ 56–57. Etheridge also contends that the individual who terminated him was Black. *See* Second Am. Cplt., at Count II, ¶ 12 (Dckt. No. 64). But in

13

reality, four individuals made the decision to terminate Etheridge's employment, and only one of them was Black. *See* Def.'s Statement of Facts, at ¶ 55 (Dckt. No. 88).

Moreover, Etheridge conceded at deposition that no one at Hudson used racially discriminatory language in their discussions with him, and that no one told him he was not awarded the day-shift position because of his race or sex. *See* Def.'s Statement of Facts, at ¶ 41 (Dckt. No. 88).

In this respect, a decision of a court in this district is instructive. In *Miller v. Chicago Transit Authority*, the employer similarly never commented on race or indicated a racial preference when discussing employees. *See Miller*, 2020 WL 554787, at *4. The court concluded that the record did not indicate any fishy background circumstances or any inclination on the part of the employer to discriminate against Caucasians. *Id.*

For similar reasons, the Court comes to the same conclusion here. The undisputed facts do not support an inference that Hudson "is one of those unusual employers who discriminate against the majority." *Id.* (citing *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999)). There is no evidence to suggest that Hudson terminated Etheridge's employment because of his race.

Turning to the second bucket, Etheridge argues that Hudson passed him over for the day-shift position in favor of female, "less experienced Black applicant[s]." He contends that this is evidence of race and sex discrimination. *See* Second Am. Cplt., at Count II, ¶ 12 (Dckt. No. 64).

But the undisputed facts show nothing fishy occurred here, either.

For starters, the timing of Etheridge's allegations doesn't add up. He alleges that he bid for an open day-shift driver position in May 2019. But at least one of the individuals he contends was hired instead of him, Angelica Clark, had in fact been a day-shift driver since

14

before Etheridge had been hired. *See* Def.'s Statement of Facts, at ¶¶ 34–36 (Dckt. No. 88). Hudson can't have denied Etheridge anything in favor of her because she already had the position. So her hiring can't be evidence of discrimination against Etheridge.

More importantly, the undisputed facts show that Hudson had good reason to pass over Etheridge in favor of Clark and Weeks: Etheridge was unqualified for the day-shift role. The day-shift position required a driver to be badged for the Midway airport. Etheridge was not "badged" for Midway. Clark and Weeks, on the other hand, were appropriately badged. *See id.* at ¶¶ 36–37, 40–42.

Hudson's job bidding process required that it award positions to qualified employees on the basis of seniority. *Id.* Here, in order to be "qualified" for the day-shift position, a driver needed to be badged for Midway. Etheridge was not so badged. Clark and Weeks were.

So Etheridge was unqualified, and he didn't get the position as a result. In short, Hudson followed its hiring process. There's nothing fishy about that.

So, as to his sex and race discrimination claims – his reverse discrimination claims – Etheridge cannot satisfy prong number one. He cannot show that Hudson had an inclination to discriminate against Caucasians or men, and there is no evidence that there is something 'fishy' afoot.

Even if Etheridge could satisfy prong number one, he nonetheless fails prong number two. Prong number two requires a plaintiff to show that he was meeting the defendant's legitimate professional expectations. Etheridge's penchant for absenteeism shows he was not.

Etheridge's attendance record speaks for itself. Etheridge failed to show up at work, without explanation and without advance notice, a dozen times. He was ultimately fired for these absences after receiving three warnings. Two of those warnings were in writing. And one

15

cautioned that it was his "final" warning. All of Hudson's conduct in this respect was in accordance with its internal attendance policy, which was made known to Etheridge when he started his employment.

Moreover, in May of 2019, when Etheridge alleges that he applied for the day-shift position, he had already failed to show up for work seven times. And he had received two warnings for these absences – one of which was in writing.

Suffice it to say that it's legitimate for an employer to expect an employee to show up for his shift. After all, 90% of life is showing up. A chronically absent employee doesn't meet that expectation. Etheridge was a chronically absent employee, and he was terminated as a result.

So Etheridge also fails at step two. The evidence does not show that he was meeting Hudson's legitimate professional expectations.

Etheridge cannot satisfy his burden under the heightened *McDonnell Douglas* framework for a reverse discrimination claim. However, even if he could, his claims would still fail. For the same reasons outlined above, Hudson provided a legitimate, non-discriminatory reason for terminating his employment and not hiring him to the day-shift position. Etheridge was chronically absent from work.

In other words, Hudson's actions were far from pretextual. To establish pretext, a plaintiff must identify "weaknesses, implausibilities, inconsistencies, or contradictions" in Hudson's reason for termination that a reasonable person would find "unworthy of credence." *Miller*, 2020 WL 5547877, at *4 (quoting *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 561 (7th Cir. 2019)). The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020).

16

The Court identifies no pretext here.  And Etheridge has not directed the Court to any evidence of pretext.  If anything, Hudson gave Etheridge even more rope than its internal policy allowed.  Under the policy, it only took four no-calls, no-shows to terminate an employee.  Yet Etheridge missed work a dozen times.  He received warning, after warning, after warning.  He received a one-day suspension.  Even so, Hudson did not fire Etheridge until after his twelfth no-call, no-show.

Etheridge does not provide any evidence that Hudson's reasons for terminating him or for failing to hire him for the day-shift position were implausible, inconsistent, or weak.  In fact, Etheridge admitted that, given his number of absences, Hudson was entitled to terminate his employment in accordance with its attendance policy.  *See* Etheridge Dep. Tr., at 320:11-21 (Dckt. No. 88-2).  There is no genuine dispute of material fact that Hudson's proffered reasoning was pretext for either race or sex discrimination.

The Court grants Hudson's motion for summary judgment as to Plaintiff's reverse race and sex discrimination claims (Counts II and III).

## II. Age Discrimination Claims (Counts IV & V)

The Court turns next to Etheridge's age discrimination claims.  He alleges that Hudson terminated his employment and failed to hire him for the day-shift position in favor of two younger employees on the basis of his age.  Count IV alleges this was a violation of the ADEA. And Count V alleges that the age discrimination was "willful," which would entitle him to liquidated damages.  *See Arroyo v. Volvo Grp. North Am., LLC*, 2019 WL 4749869, at *10 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)).

Age discrimination claims under the ADEA follow the *McDonnell Douglas* analytical framework.  *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir.

17

2021). But a recent Seventh Circuit decision, *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948 (7th Cir. 2021), explained that ADEA claims impose a higher standard than race or sex discrimination claims under Title VII. *Id.* In age discrimination cases, the plaintiff must show that age was the "but for" cause of the allegedly discriminatory employment action. *Id.*

Here, Etheridge's ADEA claims fail for the same reasons his Title VII claims fail: he can show no prima facie case of discrimination under *McDonnell Douglas*.

Again, Etheridge cannot point to a genuine dispute of material fact that he was fulfilling Hudson's legitimate expectations at the time of his termination, or when he didn't receive the day-shift position. The undisputed facts overwhelmingly point in the opposite direction: Etheridge was consistently failing to show up for work.

Moreover, he does not show that similarly situated employees outside of the class received more favorable treatment. Although two younger employees – Weeks and Clark – received the day-shift job, they were not similarly situated to Etheridge.

Etheridge was unqualified for the day-shift role because he was not "badged" for the Midway airport. In contrast, the evidence shows that Clark and Weeks were appropriately badged. They were qualified; he was not. In order to make a prima facie case, Etheridge would have to point to a similarly situated – meaning, unbadged – employee receiving favorable treatment. He has not.

And, once more, even if Etheridge could make a prima facie showing of age discrimination, Hudson had a legitimate, non-discriminatory reason for terminating his employment and not awarding him the day-shift role.

First, Etheridge was unqualified for the day-shift role. The day-shift role required drivers to make deliveries at Midway, and that in turn required drivers to be badged for Midway.

Etheridge wasn't badged. So he wasn't qualified for the role. It's legitimate and non-discriminatory to not hire an unqualified employee.

Second, as discussed above, at least one of the individuals to whom Etheridge points – Clark – was already a day-shift driver by the time he alleges to have applied for the position. So he was not denied anything in favor of her.

Etheridge puts forward no evidence that would create a genuine dispute of material fact that Hudson discriminated against him because of his age. The Court grants Hudson's motion for summary judgment as to Plaintiff's age discrimination claims (Counts IV and V).

### III. Disability Discrimination Claim (Count I)

Finally, the Court turns to Etheridge's disability claim.

To establish a prima facie claim under ethe ADA, a plaintiff must prove three elements: first, that he is disabled; second, that he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and third, that the adverse job action was caused by his disability. *See Patel v. Brennan*, 2021 WL 5937769, at *10 (N.D. Ill. 2021) (citing *Stelter v. Wis. Physicians Serv. Ins. Corp.*, 950 F.3d 488, 490 (7th Cir. 2020)).

For starters, Plaintiff's disability discrimination claim fails because he cannot satisfy the first element. Etheridge has not shown that he is disabled. Instead, the evidence shows that he had hay fever, which is not a disability in this instance.

The ADA defines disability as a "physical or mental impairment that substantially limits one or more major life activities." *See* 42 U.S.C. § 12102(1). An impairment substantially limits a major life activity when a person "is either unable to perform a major life activity or is significantly restricted as to the condition, manner or duration under which the individual can perform the major life activity as compared to the average person in the general population."

19

*Blazek v. ADT Sec. LLC*, 2019 WL 2297317, at *4 (N.D. Ill. 2019) (internal quotations omitted) (quoting *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001)).

To determine whether an impairment is substantially limiting, courts consider the nature and severity of the impairment, its duration or expected duration, and its permanent, long-term impact, or expected impact. *Id.*; *see also* 29 C.F.R. § 1630.2(j)(2). "Merely having a physical injury or medical condition is not enough." *Blazek*, 2019 WL 2297317, at *4 (quotations omitted) (quoting *Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011)).

Here, Etheridge's claims about his disability are vague. He alleges that he developed "respiratory issues" as a result of his employment with Hudson. *See* Second Am. Cplt., at Count I, ¶ 14 (Dckt. No. 64). Specifically, he alleges that he was exposed to toxic paint fumes while making deliveries on behalf of Hudson to O'Hare terminals in which construction was taking place. *Id.* at ¶¶ 14–15. He alleges that this left him unable to breathe. *Id.* at ¶ 19. And he contends that he has been permanently disabled since September 2019 as a result. *Id.* at ¶ 16.

To be sure, "breathing" is a major life activity. *See* 29 C.F.R. § 1630.2(i)(1)(i); *see also Scheidt v. Floor Covering Assocs.*, 2018 WL 4679582, at *5 (N.D. Ill. 2018). However, Etheridge has not presented evidence that would allow a reasonable jury to conclude that any respiratory issues he experienced substantially limited his ability to breathe.

As the Seventh Circuit held in *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 522 (7th Cir. 2009), "[v]ague assertions of difficulty performing a major life activity do not create a genuine issue of material fact, particularly when unaccompanied by any evidence that the limitation is substantial to that compared to that of other adults."

*Fredricksen* involved a plaintiff's contention that he was substantially limited in the major life activity of breathing. The plaintiff claimed that an enlarged spleen prevented him

from taking "a full breath" at times.  *Id.*  This problem was allegedly exacerbated by chronic

sinusitis.  *Id.*

 The Seventh Circuit affirmed the district court's holding that the plaintiff was not

disabled.  The Court of Appeals concluded that he had provided no evidence about the severity

of his alleged chronic sinusitis and its impact on his ability to breathe.  *Id.*  In other words, there

was no evidence showing that the plaintiff's difficulty breathing was substantial.  *Id.*

 This Court reaches the same conclusion here.  Etheridge provides scant information about

his respiratory issues.  He states only that "he could not breathe as a result of breathing in toxic

fumes at O'Hare."  But no evidence indicates that his respiratory issues substantially limited a

major life activity.

 Etheridge's medical records instead point in the other direction.  Etheridge sought

medical care for his respiratory issues on June 9, 2019.  *See* Def.'s Statement of Facts, at ¶ 46

(Dckt. No. 88).  His medical care provider treated him for "acute seasonal allergic rhinitis" –

colloquially, hay fever.  *Id.* at ¶¶ 48–49.  He was prescribed an allergy medication, Zyrtec.  *Id.* at

¶ 48.  And he received a note from his medical provider indicating he could return to work

without limitation just three days later.  *Id.* at ¶ 47.

 This record shows that Etheridge experienced a routine illness and received treatment

advising a couple days' rest – not that he became disabled within the meaning of the ADA.  The

Court appreciates the discomfort of hay fever and does not seek to underplay the severity of

Plaintiff's symptoms.  At the same time, Plaintiff has not put forward any medical evidence

explaining how and to what degree his illness substantially limited his ability to perform any

major life activity.

Instead, Etheridge offers only the bare assertions of disability found in his Second Amended Complaint. Naked assertions aren't enough at summary judgment. For example, in *Johnson v. Beach Park Sch. Dist.*, 103 F. Supp. 3d 931, 940 (N.D. Ill. 2015), *aff'd*, 638 F. App'x 501 (7th Cir. 2016), a court in this district found that plaintiff's vague claims that she had "fibromyalgia and other unspecified disabilities" were insufficient for a jury to find that any major life activities were substantially limited as a result.

Here, as in *Johnson*, Etheridge's vague assertions of difficulty breathing are not enough to allow a reasonable juror to conclude that any major life activities were substantially limited as a result of his claimed disability. The Court concludes that Etheridge was not disabled for the purposes of the ADA.

Even if Etheridge was disabled, he fails to satisfy the second prong. That prong requires that a plaintiff show that he was otherwise qualified to perform the essential functions of the position with or without reasonable accommodation. Here, to the extent that Etheridge alleges that he was discriminated against when Hudson failed to give him the day-shift position, there is no evidence that he was otherwise qualified to perform it.

Again, Etheridge was not "badged" to drive at Midway. He was unqualified for the role. Courts in this district have regularly held that plaintiffs who lacked proper driving certification may not claim that they were unlawfully denied employment for a position that they were never qualified to perform. *See Gaspar v. DS Waters of Am.*, 2013 WL 2355994, at *5–6 (N.D. Ill. 2013).

For example, when an individual fails to obtain an Illinois Department of Transportation certification, courts have held that they are not qualified to drive a commercial vehicle at all and may not assert an ADA claim. *Id.*

Here, although it is not clear to the Court whether "badging" for Midway airport is a certification internal to Hudson, the principal is the same. Regardless of his alleged disability, Etheridge lacked the credentials to perform the job to which he applied. So he fails the second prong.

Finally, the Court notes that a plaintiff can also prove employment discrimination under the ADA through the burden-shifting framework of *McDonnell Douglas*. *See Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). Under that approach, a plaintiff must establish a prima facie case of disability discrimination.

So the plaintiff must show four things, which by now sound familiar. First, the plaintiff must show that he belongs to a protected class, meaning that he is disabled under the ADA. Second, he must show that he performed his job to the defendant's legitimate expectations. Third, he must show that he suffered an adverse employment action. And fourth, he must show that similarly situated employees outside of his protected class were treated more favorably by the defendant. *Patel*, 2021 WL 5937769, at *11 (citing *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020)).

But like his other discrimination claims, Etheridge cannot make this showing.

For one, the Court finds that he was not disabled for purposes of the ADA, and so was not a member of a protected class.

Second, he did not perform his job to Hudson's legitimate expectations. Instead, he was repeatedly disciplined for skipping work without explanation.

Third, Etheridge has not pointed to evidence showing Hudson treated non-disabled employees more favorably. There is no evidence that non-disabled workers in his position were not terminated.

Last, and for the sake of completeness, Etheridge's disability claims fail for a separate reason: he did not exhaust his administrative remedies.

"[A] plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Williams v. City of Chicago*, 2022 WL 2915632, at *4 (N.D. Ill. 2022) (quoting *Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018)).

Here, Etheridge did assert disability claims in his EEOC charge, dated August 9, 2019. *See* Def.'s Statement of Facts, at ¶ 44. However, Etheridge testified that those claims related only to the injuries associated with the altercation with his co-worker. *Id.* They said nothing about his respiratory disabilities. *Id.*

The Court cannot say that Etheridge's respiratory disability claims are reasonably related to his injuries suffered as a result of the workplace altercation. To be reasonably related, the federal claim and the claim in the charge of discrimination must, at a minimum, describe the same conduct and implicate the same individuals. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 258 (7th Cir. 2011). Put another way, there must be a factual relationship between the claims in the charge and in the complaint. *Quinn v. Chicago Transit Auth.*, 2018 WL 4282598, at *4 (N.D. Ill. 2018) (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).

The claims in the charge and in the complaint do not describe the same conduct. The disability alleged in the EEOC charge stemmed from the workplace altercation. The alleged respiratory disability described in the Second Amended Complaint did not grow out of the workplace altercation, but rather out of making deliveries at O'Hare. One alleged disability was caused by a co-worker; the other was caused by exposure to paint fumes. Accordingly,

24

Etheridge's respiratory disability claim is not considered to be part of his EEOC charge, has not been administratively exhausted, and so his disability discrimination claim fails as a matter of law.

All told, Etheridge does not put forward any evidence that would create a genuine dispute of material fact that Hudson discriminated against him because of any disability. The Court grants Hudson's motion for summary judgment as to Plaintiff's disability discrimination claim (Count I).

## IV.    Viewing the Evidence as a Whole

For good measure, this Court took a step back, and surveyed the case as a whole. In recent years, the Seventh Circuit has pivoted away from the direct and indirect methods, and has moved toward a more holistic approach to the evidence. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in [*Ortiz*] that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igasaki*, 988 F.3d at 957 (citing *Ortiz*, 834 F.3d at 766).

The evidentiary landscape of the case looks the same when viewed as a whole, with a broader lens. The record completely lacks any evidence supporting the notion that Hudson Group discriminated against Etheridge in any way. If anything, the evidence supports the notion that Hudson Group bent over backwards and kept him employed, despite absence after absence. Viewed from any angle with any lens, the record does not come close to supporting a discrimination claim.

**Conclusion**

At the end of the day, Etheridge failed to respond to the Defendant's motion for summary judgment. He has not put forward any evidence that Hudson discriminated against him due to his sex, race, age, or disability. All he has are bare assertions, which, without supporting evidence, are insufficient to stave off summary judgment. A person who comes to court with only allegations at the summary judgment stage comes to court empty handed.

Moreover, Hudson has presented evidence that it terminated Etheridge's employment and passed over him for the day-shift position for legitimate, non-discriminatory reasons. Namely, Etheridge had gone AWOL from work a dozen times despite a series of escalating warnings and a suspension. Accordingly, Etheridge's discrimination claims fail as a matter of law. The Court grants Defendant's motion for summary judgment in full.

Date:   October 27, 2022

_____

Steven C. Seeger
United States District Judge